UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------- X
MEDIA GLOW DIGITAL, LLC          :
and TIMES SQUARE LED, LLC,        :
                                  :
                Plaintiffs,       :
                                  :
     -against-                    :
                                  :
PANASONIC CORPORATION OF NORTH    :
AMERICA, et al.,                  :
                                  :
                Defendants.       :
------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 05/11/2018

No. 16 Civ. 7907 (JFK)
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFFS MEDIA GLOW DIGITAL, LLC and TIMES SQUARE LED, LLC
    Ian M. Goldrich
    Frederick L. Whitmer
    Cole Ramey
    KILPATRICK TOWNSEND & STOCKTON LLP

FOR DEFENDANT PANASONIC CORPORATION OF NORTH AMERICA
    Michael L. Simes
    Jonathan T. Blank
    Elizabeth A. Hutson
    MCGUIRE WOODS LLP

**JOHN F. KEENAN, United States District Judge:**

Before the Court is a motion by Defendant Panasonic

Corporation of North America ("Panasonic") for partial judgment

on the pleadings, pursuant to Federal Rule of Civil Procedure

12(c). Panasonic argues that, under the terms of two

agreements, Plaintiffs Media Glow Digital, LLC ("MGD") and Times

Square LED, LLC ("TSL," and, together with MGD, "Plaintiffs")

are prohibited from recovering certain kinds of damages in

connection with their claims against Panasonic. To the extent

that Plaintiffs seek consequential or punitive damages,

1

Panasonic seeks dismissal of Plaintiffs' claims against it.  For
the reasons stated below, Panasonic's motion is granted.

## I. Background

## A. Factual Background

Unless otherwise indicated, the following allegations are
drawn from the second amended complaint (the "Complaint").

MGD is an Oklahoma limited liability company with its
principal place of business in Oklahoma. (Sec. Am. Compl. ¶ 2
[hereinafter "Compl."], ECF No. 33 (filed May 8, 2017).)  The
members of MGD are individuals who reside in Oklahoma. (Id.)
TSL is also an Oklahoma limited liability company with its
principal place of business in Oklahoma. (Id. ¶ 3.)  Its sole
member is an entity organized under the laws of Oklahoma with
its principal place of business in Oklahoma. (Id.)  The
defendants are:  (1) Panasonic, a Delaware corporation with its
principal place of business in New Jersey; (2) ICON LLC, ICON
PLLC, and ICON HD (collectively, "ICON"), North Dakota limited
liability companies with their principal places of business in
North Dakota; (3) Earl B. Lovell – S.P. Belcher, Inc. ("Lovell-
Belcher"), a New York corporation with its principal place of
business in New York; and (4) NY Land Surveyor P.C., a New York
professional corporation with its principal place of business in
New York. (Id. ¶¶ 4-9.)

In late 2009 and early 2010, MGD obtained a lease for the construction and operation of a large electronic sign (the "Millennium Sign") on the west-facing façade of the Millennium Broadway hotel (the "Millennium Hotel"), located on West 44th Street near Times Square. (Id. ¶ 14.) Thereafter, MGD negotiated a long-term lease with the Millennium Hotel, commencing in April 2010. (Id.) The Millennium Sign was to stretch approximately twenty-five floors on the face of the Millennium Hotel and had to be designed so as not to encroach on the air space rights of the adjacent property, known as the Bow Tie Building. (Id. ¶¶ 15-16.)

In June 2011, MGD hired Lovell-Belcher to conduct a professional survey of the Millennium Hotel's west-facing façade, including the air space rights (the "Lovell-Belcher Survey"). (Id. ¶ 18.) After initially consulting with other manufacturers, MGD entered discussions with Panasonic for the purchase and construction of the Millennium Sign. (Id. ¶¶ 17, 21.) On December 5, 2011, MGD entered into an agreement with Panasonic (the "Millennium Agreement"). (Id. ¶ 27.) In the Millennium Agreement, Panasonic agreed to design, fabricate, and deliver the Millennium Sign pursuant to the applicable technical specifications and building codes, and within the air space available. (Id. ¶¶ 29-30.)

Under the Millennium Agreement, Panasonic agreed to

"provide a preliminary design package within 2 weeks of detailed

site survey being completed on site." (Id. ¶ 30; see also

Millennium Agreement § 1.1, Panasonic Mem. Ex. 1, ECF No. 82-1

(filed November 30, 2017).)  The Millennium Agreement also

contains a section titled "Limitation on Liability," which

provides:

> None of the parties, its agents, affiliates,
> customers, or any other persons, shall be liable
> to the other party for any lost profits,
> incidental, indirect or consequential damages,
> arising under this products agreement.  The
> maximum amount of any Panasonic liability to
> [MGD] shall be limited to the total dollar amount
> of any [MGD] purchase of equipment, integrated
> systems, or related services that is subject of
> the claim of liability.

Millennium Agreement Ex. A § 5.1.  In exchange for Panasonic's

performance, MGD agreed to pay approximately $4.183 million,

with a down payment of 50 percent and the remaining balance due

in installments. (Compl. ¶ 31.)  Installation of the Millennium

Sign was supposed to commence in March 2012 and be complete

within three-to-four months. (Id. ¶¶ 32-33.)

Panasonic outsourced fabrication work to SZRetop Shenzhen,

a Chinese company allegedly known for poor quality and defective

products. (Id. ¶ 35.)  Panasonic also outsourced design,

construction, and installation work to ICON, a "modest

architectural and engineering group" with "little, if any,

experience designing, constructing, or installing large LED[1] signs similar to the Millennium Sign[.]" (Id. ¶¶ 36-37.) Plaintiffs evidently did not object to Panasonic's outsourcing decisions at the time, and "[t]hroughout the project, ICON communicated directly and consistently with MGD and its agents regarding the work." (Id. ¶¶ 38-39.)

Installation of the Millennium Sign did not begin in March 2012 and the project suffered several delays. On March 13, 2012, Panasonic represented to MGD that the Millennium Sign "had been ordered from the factory and [would] be arriving shortly[.]" (Id. ¶ 43.) However, after MGD made an installment payment of $898,000, Panasonic informed MGD that certain components had not been ordered and would take several more months to fabricate. (Id. ¶¶ 43-44.) In April 2012, MGD and the Millennium Hotel entered into negotiations regarding revised lease terms. (Id. ¶ 45.) Work on the Millennium Sign "paused briefly," but Panasonic and ICON confirmed that they stood ready to commence installation. (Id. ¶¶ 45, 48.)

On March 1, 2013, MGD asked Panasonic to commence installation. (Id. ¶ 49.) ICON purportedly had failed to apply for the necessary permits or engage local trades to mount the Millennium Sign, and Panasonic and ICON informed MGD that they

---

[1] The abbreviation "LED" apparently stands for light-emitting diode.

needed an additional four-to-six months to complete work. (Id.)
Panasonic subsequently submitted a revised schedule calling for
installation of the Millennium Sign between June and August
2013. (Id. ¶ 51.) Nevertheless, by October 2013, the Millennium
Sign was still not complete, owing to delays in obtaining
permits, meeting code requirements, and supplying manpower for
installation work. (Id. ¶¶ 52, 57.)

The Millennium Hotel, which expected to share in revenue
generated by the Millennium Sign, demanded that MGD enter into a
new long-term lease that included a $1.6 million non-refundable
prepayment. (Id. ¶ 55.) After Panasonic and ICON assured MGD
that completion of the Millennium Sign was imminent, MGD made
the $1.6 million payment to the Millennium Hotel. (Id. ¶ 56.)
Subsequently, counsel for the Bow Tie Building notified MGD that
the Millennium Sign as designed unlawfully encroached on the Bow
Tie Building's air space. (Id. ¶ 58.) After MGD informed
Panasonic of the Bow Tie Building's complaint, Panasonic
acknowledged that that neither it nor ICON had conducted a site
survey, but rather had relied on the Lovell-Belcher Survey. (Id.
¶ 61.) MGD contracted for another survey of the site to test
the encroachment accusation, which revealed that the Lovell-
Belcher Survey was off by approximately three inches in certain
areas. (Id. ¶ 62.) By early 2014, MGD had paid more than $3
million to Panasonic in connection with the Millennium Sign and

an additional $3 million in rent and other expenses. (Id. ¶ 65.)

MGD abandoned its plan to install the Millennium Sign at the Millennium Hotel, but was aware of another opportunity to lease space for a similar sign at the nearby DoubleTree Suites hotel (the "Doubletree Hotel"), located at the corner of 7th Avenue and West 47th Street. (Id. ¶¶ 65, 67.) Around this time, the principals of MGD organized TSL and, on June 12, 2014, TSL reached an agreement with Panasonic (the "Doubletree Agreement") to repurpose the Millennium Sign for the new location. (Id. ¶¶ 69-70.) Hereafter, the Court will refer to the Millennium Sign as the "Doubletree Sign."

Under the Doubletree Agreement, Panasonic pledged that final installation and completion of the Doubletree Sign would take place within three months. (Id. ¶ 71.) Panasonic also entered into a marketing agreement with TSL, whereby Panasonic agreed to purchase advertising on the Doubletree Sign at a rate of $50,000 per month. (Id. ¶ 73.) Additionally, the Doubletree Agreement, like the Millennium Agreement, contains a section titled "Limitation on Liability," which provides:

> Except with respect to the indemnification obligations of the parties set forth above and for any damages incurred by [TSL] as a result of a default by Panasonic under the purchase agreement which causes a default under the lease or the license agreement, in no event shall either party be liable, to the other party, or any third party, for indirect, special, incidental, punitive, or consequential damages,

> loss or expenses of any kind (including, but not
> limited to, business interruption, lost business,
> lost profits, or lost savings), even if such
> party has been advised of their possible
> existence, which arise under or by reason of the
> purchase agreement.

(Doubletree Agreement Ex. A § 7, Panasonic Mem. Ex. 2, ECF No.

82-2 (filed Nov. 30, 2017).)

On August 8, 2014, TSL entered into a twenty-year lease

requiring monthly rental payments of $60,000 to the Doubletree

Hotel. (Id. ¶ 74.)  In March 2015, approximately three weeks

before the lease term was set to commence, Panasonic informed

TSL that it would commence installation immediately and that it

would complete the project by June 12, 2015. (Id. ¶¶ 75-76.)

Shortly thereafter, Panasonic notified TSL that it could not

meet the June 12, 2015 deadline and would achieve substantial

completion by August 2015. (Id. ¶ 77.)  Panasonic again

entrusted ICON with constructing and installing the Doubletree

Sign, and ICON was again slow to mobilize, resulting in delays.

(Id. ¶¶ 78-79.)  Ultimately, ICON completed installation of the

Doubletree Sign in October 2015. (Id. ¶ 81-82.)

Several defects in the Doubletree Sign quickly became

clear.  For example, there are "dark spots" visible to the naked

eye, lights that improperly change colors, and other lights that

blink on and off. (Id. ¶ 82.)  Moreover, the Doubletree Sign has

suffered various outages that migrate from "panel to panel" and

"strip to strip." (Id. ¶¶ 84, 87.)  Additionally, the Doubletree

Sign is constructed in a way that "a number of the panels are

not aligned tightly against each other," which results in "large

and unsightly dark seams that run down and across the face" of

the Doubletree Sign. (Id. ¶ 91.)

A number of components were repaired or replaced between

October 2015 and the middle of 2016, but experts have advised

TSL to consider replacing the Doubletree Sign rather than

continuing to repair it. (Id. ¶¶ 86, 95.)  TSL has paid more

than $1 million in rent to the Doubletree Hotel and lost

"millions in advertising revenues" as a result of the delayed

and defective installation. (Id. ¶¶ 97-98.)  Panasonic has not

paid for any advertising on the Doubletree Sign. (Id. ¶ 98.)

## B. Procedural History

On May 8, 2017, Plaintiffs filed the second amended

complaint, alleging seven causes of action against Panasonic,

ICON, Lovell-Belcher, and NY Land Surveyor P.C.  For purposes of

the instant motion, only four causes of action against Panasonic

are relevant:  (1) breach of contract; (2) breach of warranty;

(3) negligence and negligent misrepresentation; and (4) fraud

and fraudulent inducement. (Id. ¶¶ 107-117, 126-136.)

Plaintiffs seek damages, including punitive damages, in excess of $15 million.[2]

On November 30, 2017, Panasonic filed the instant motion under Rule 12(c). Panasonic asserts that it is entitled to partial judgment on the pleadings because specific provisions of the Millennium Agreement and the Doubletree Agreement (together, the "Agreements") foreclose the possibility of Plaintiffs recovering certain kinds of damages. The Court heard oral argument on January 23, 2018.

## II. Legal Standard

Rule 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law." Dingle v. City of New York, 728 F. Supp. 2d 332, 343 (S.D.N.Y. 2010).

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).

---

[2] According to Panasonic, Plaintiffs may seek as much as $31 million in damages. (See Panasonic Mem. at 7, ECF No. 82 (filed Nov. 30, 2017).)

The court must accept "as true the complaint's factual allegations" and draw "all inferences in the plaintiff's favor." Id. "To survive a Rule 12(c) motion, [plaintiffs'] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010) (alteration in original). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"On a [Rule] 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (quoting Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009)). "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Id. (alteration in original). A document is "integral" to the complaint if the complaint "relies heavily upon its terms and effect." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## III. Discussion

In the instant motion, Panasonic seeks an order "[d]ismissing all Counts to the extent that they seek lost profits, incidental, indirect, consequential, special, punitive, or otherwise unrecoverable damages[.]" (Mot. at 2, ECF No. 81 (filed Nov. 30, 2017).) Panasonic contends that it is entitled to the relief requested because § 5.1 of the Millennium Agreement and § 7 of the Doubletree Agreement (together, the "limitation of damages clauses" or "LDCs") prohibit Plaintiffs from recovering these kinds of damages. Plaintiffs contend that Panasonic's motion is without merit because their allegations of Panasonic's "gross negligence" preclude enforcement of the LDCs. (Pls.' Mem. in Opp'n at 7, ECF No. 85 (filed Dec. 29, 2017).) Plaintiffs also argue that the LDCs are not enforceable because they are unconscionable. (Id. at 12.)

As a threshold matter, the Court concludes that it is appropriate for purposes of the instant motion to consider the Agreements and their terms. "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." L-7 Designs, Inc., 647 F.3d at 422 (alteration in original). Although the Agreements are not attached as exhibits to the complaint, Plaintiffs refer to the terms of the

Agreements throughout their papers.  For example, the Complaint refers to terms related to pricing, the time for performance, and an advertising agreement between Panasonic and Plaintiffs. (See Compl. ¶¶ 30-31, 72.)  Given the Complaint's heavy reliance upon the Agreements' terms and effect, the Court concludes that the Agreements are integral to the Complaint.[3] See Chambers, 282 F.3d at 153.

## A. The LDCs are Enforceable

Contractual provisions limiting liability are generally enforceable.  "New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed." Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 138 (2d Cir. 2016).  Here, it is not disputed that the LDCs, by their terms, clearly constrain the scope of available damages.  Thus, unless the LDCs are unenforceable or otherwise do not apply, Plaintiffs are not entitled to recover the kinds of damages specifically prohibited by the LDCs.

Plaintiffs argue that the LDCs are unenforceable in light of the Complaint's allegations of "acts of fraud and gross

_____

[3] The Court also notes that Plaintiffs have not disputed the proposition that it is appropriate for the Court to consider the Agreements.

13

negligence by Panasonic." (Pls.' Mem. in Opp'n at 9.)  Under New
York public policy, "a party may not insulate itself from
damages caused by grossly negligent conduct[.]" Sommer v. Fed.
Signal Corp., 593 N.E.2d 1365, 1370 (N.Y. 1992).  According to
Plaintiffs, Panasonic behaved in a grossly negligent or
recklessly indifferent manner by (1) outsourcing work to ICON,
and (2) relying on the Belcher-Lovell Survey rather than
performing its own survey. (Pls.' Mem. in Opp'n at 3-4.)

To show that Panasonic's conduct was grossly negligent,
Plaintiffs must meet an "exacting standard," especially in light
of the parties' sophistication. See Baidu, Inc. v. Register.com,
Inc., 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010).  In such
circumstances, "the defendant's conduct must amount to
intentional wrongdoing, willful conduct that is fraudulent,
malicious or prompted . . . by one acting in bad faith, or
conduct constituting gross negligence or reckless indifference
to the rights of others." Id. (internal quotation marks
omitted).  Accordingly, "'gross negligence' differs in kind, not
only degree, from claims of ordinary negligence." Colnaghi,
U.S.A., Ltd. v. Jewelers Protection Servs., Ltd., 611 N.E.2d
282, 284 (N.Y. 1993).

Case law demonstrates that "New York courts applying the
Colnaghi rule take this distinction seriously." Indus. Risk
Insurers v. Port Auth. of N.Y. & N.J., 387 F. Supp. 2d 299, 306

(S.D.N.Y. 2005). For example, in Abacus Federal Savings Bank v. ADT Security Services, Inc., the New York Court of Appeals examined allegations against the defendant security companies after the plaintiff bank was burglarized. 967 N.E.2d 666, 667-68 (N.Y. 2012). The court held that the plaintiff adequately alleged conduct constituting gross negligence where the defendants (1) "had knowledge—for weeks, if not months—that the [security] equipment had been malfunctioning," and (2) "not only failed to investigate the source of their equipment malfunction, but they failed to put anyone at the branch on notice of the potential security breach." Id. at 669-70.

Similarly, in Baidu, a court in this District analyzed allegations that a domain name registrar failed to follow its own security protocols and permitted an intruder to gain unauthorized access to the plaintiff's confidential and proprietary account information. 760 F. Supp. 2d at 314. The Court concluded that the plaintiff adequately alleged gross negligence where, among other things, the defendant "failed to follow its own security protocols and essentially handed over control of [the plaintiff's] account to an unauthorized Intruder, who engaged in cyber vandalism" and failed "to even look at the security code sent back by the Intruder[.]" Id. at 319.

Plaintiffs' allegations fall short of these showings of gross negligence. Plaintiffs argue that Panasonic's decision to engage ICON reflected "reckless indifference," but cite no authority for the proposition that outsourcing work to another party rises to the level of gross negligence. (See Pls.' Mem. in Opp'n at 3.) Plaintiffs do not contend that Panasonic was contractually prohibited from outsourcing aspects of the work. Moreover, "[t]hroughout the project, ICON communicated directly and consistently with MGD and its agents regarding the work." (Compl. ¶ 39.) Plaintiffs' willingness to work with ICON undermines its position that Panasonic's decision to outsource work to ICON displayed a reckless indifference to Plaintiffs' rights.

Plaintiffs also claim that the Millennium Agreement required Panasonic to perform its own survey and argue that Panasonic's failure to do so was grossly negligent. (Id. ¶¶ 59, 63, 110; Pls.' Mem. in Opp'n at 4.) However, the actual text of the Millennium Agreement does not appear to impose such a requirement. (See Millennium Agreement § 1.1 ("Panasonic will provide a preliminary design package within 2 weeks of [a] detailed site survey being completed on site.").) Even assuming that Panasonic had a contractual obligation to conduct its own survey, the failure to do so amounts to a breach of contract, not gross negligence. Panasonic relied on a survey conducted by

"a licensed New York surveying company," which was completed
just several months before the Millennium Agreement was struck.
(Compl. ¶¶ 18, 61.)  There is no allegation that Panasonic had
advance knowledge that the Lovell-Belcher Survey was flawed or
that relying on it would cause injury to any party. Cf. Abacus,
967 N.E.2d at 669.  Nor do Plaintiffs allege that Panasonic's
failure to conduct its own survey, or its reliance on a survey
completed by a licensed professional, was a breach of
Panasonic's internal protocols. Cf. Baidu, 760 F. Supp. 2d at
319.  Accordingly, Plaintiffs fail to allege that Panasonic
behaved in a grossly negligent manner.

Furthermore, the Court concludes that the LDCs are not
unconscionable.[4]  To demonstrate unconscionability, "there must
be a showing that . . . a contract is both procedurally and
substantially unconscionable." Ragone v. Atl. Video at Manhattan
Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quoting Nayal v. HIP
Network Servs. IPA, Inc., 620 F. Supp. 2d 566, 571 (S.D.N.Y.

---

[4] The Court rejects Plaintiffs' argument that deciding "the
question of unconscionability is unwarranted and premature."
(Pls.' Mem. in Opp'n at 11.)  "The determination of
unconscionability is a matter of law for the Court to decide."
I.C. ex rel Solovsky v. Delta Galil USA, 135 F. Supp. 3d 196,
211 (S.D.N.Y. 2015) (quoting Simar Holding Corp. v. GSC, 928
N.Y.S.2d 592, 595 (App. Div. 2011)).  At least one other court
in this Circuit has ruled, in deciding a Rule 12(c) motion, that
a limitation of liability provision was not unconscionable. See
Pacs Indus. v. Cutler-Hammer, Inc., 103 F. Supp. 2d 570, 573
(E.D.N.Y. 2000).

2009)).  The procedural unconscionability inquiry "concerns the contract formation process and the alleged lack of meaningful choice[.]" Id. at 121-22.  The substantive unconscionability inquiry "looks to the content of the contract[.]" Id.  Contract terms that are "unreasonably favorable" to one party may support a finding of substantive unconscionability. Id. at 122.

Plaintiffs do not demonstrate procedural unconscionability because they fail to show that they lacked a "meaningful choice" in entering into the Agreements.  In the procedural unconscionability inquiry, "[t]he focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power[.]" Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828 (N.Y. 1988) (citation omitted). Plaintiffs are sophisticated commercial entities who purchased the right to operate a large electronic sign in Times Square, negotiated a long-term lease for the purpose of displaying the sign, and consulted various manufacturers in connection with fabricating the sign. (Compl. ¶¶ 14, 17.)  There are no allegations regarding a disparity in bargaining power or the use of confusing or hidden language in the LDCs.  Furthermore, Plaintiffs' awareness of Panasonic's deficient performance under

the Millennium Agreement undermines the proposition that they lacked a "meaningful choice" in entering into the Doubletree Agreement.

Nor do Plaintiffs make a compelling showing of substantive unconscionability. "This question entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged[.]" Gillman, 534 N.E.2d at 829. Plaintiffs make the conclusory assertion that the LDCs "unreasonably favor Panasonic" without any specific reference to the terms of the LDCs themselves. (Pls.' Mem. in Opp'n at 12.) Plaintiffs have not identified anything unusual about the LDCs, however, and New York courts "routinely enforce[]" contractual provisions that limit liability. Process Am., Inc., 839 F.3d at 138. Furthermore, the LDCs apply to both Plaintiffs and Panasonic. See Barreto v. JEC II, LLC, 16-cv-9729 (KBF), 2017 WL 3172827, at *5 (S.D.N.Y. July 25, 2017) (observing that "the arbitration agreements at issue here bind both plaintiffs and defendants" before concluding that "the arbitration agreements do not unreasonably favor defendants and are not substantively unconscionable"). Considering the commercial context, purpose, and effect of the LDCs, the Court is not convinced that they are substantively unconscionable. See Gillman, 534 N.E.2d at 829.

Accordingly, the LDCs are enforceable.

**B. The LDCs Limit the Damages that Plaintiffs May Recover**

Having concluded that the LDCs are enforceable, the Court now turns to determining the effect of their terms. The Court begins by summarizing the kinds of damages identified in the Complaint. First, Plaintiffs seek damages for payments made to Panasonic.[5] (Compl. ¶ 65) Second, Plaintiffs seek damages for the advertising revenues that they lost as a result of the delays and deficiencies associated with producing and installing the Millennium Sign and, later, the Doubletree Sign. (Id. ¶¶ 65, 98.) Third, Plaintiffs seek damages for payments made to the Millennium Hotel and Doubletree Hotel. (Id. ¶¶ 65, 97.) Fourth, Plaintiffs seek damages for expenses they incurred related to the construction, operation, and maintenance of the Doubletree Sign. (Id. ¶ 97.) Finally, Plaintiffs seek punitive damages.

With respect to Panasonic, Plaintiffs are not entitled to recover damages for lost advertising revenues or payments to third parties because these kinds of damages qualify as "consequential damages." Lost profits, such as the advertising revenue that Plaintiffs expected to generate through agreements with third parties, qualify as consequential damages. See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d

---

[5] Panasonic evidently concedes that such damages might be available if Plaintiffs were to prevail on their claims. (See Panasonic Mem. at 2, 6-7.)

89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements."). Likewise, Plaintiffs' payments to third parties—including the Millennium Hotel, the Doubletree Hotel, and others in connection with constructing, operating, and maintaining the Doubletree Sign—qualify as consequential damages. See Schonfeld v. Hilliard, 218 F.3d 164, 176 (2d Cir. 2000) (explaining that consequential damages "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach"). Panasonic is entitled to judgment on the pleadings on this issue because both Agreements explicitly prohibit Plaintiffs from recovering "consequential damages" from Panasonic. (See Millennium Agreement Ex. A § 5.1; Doubletree Agreement Ex. A § 7.)

As noted above, Plaintiffs also seek punitive damages. As an initial matter, "[p]unitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights[.]" Rocanova v. Equitable Life Assur. Soc. of the United States, 634 N.E.2d 940, 943 (N.Y. 1994); see also TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 94 (2d Cir. 2005). Accordingly, with respect

to Plaintiffs' claim for breach of contract against Panasonic, New York law prohibits the recovery of punitive damages.

To the extent that Plaintiffs seek punitive damages in connection with their other claims against Panasonic, the Agreements also foreclose that possibility. The Doubletree Agreement explicitly prohibits recovery of punitive damages. (Doubletree Agreement Ex. A § 7 ("[I]n no event shall either party be liable, to the other party, or any third party, for . . . punitive . . . damages[.]").) Although the Millennium Agreement contains no explicit reference to "punitive damages," it limits the "maximum amount" of Panasonic's liability to "the total dollar amount of any [MGD] purchase of equipment, integrated systems, or related services[.]" (Millennium Agreement Ex. A § 5.1.) An award of punitive damages would clearly be incompatible with these provisions.

In opposition, Plaintiffs assert that "a motion to dismiss a demand for punitive damages should not be granted on a Rule 12 motion unless the pleading alleges no facts to support such an award." (Pls.' Mem. in Opp'n at 13.) However, unlike the present action, the cases upon which Plaintiffs rely do not give any indication that a contractual clause limiting liability was at issue. See New York Islanders Hockey Club, LLP v. Comerica Bank-Texas, 71 F. Supp. 2d 108 (E.D.N.Y. 1999); China Trust Bank of New York v. Standard Chartered Bank, PLC, 981 F. Supp. 282

(S.D.N.Y. 1997). Thus, in each of the authorities Plaintiffs cite, the court was not in a position to rule, based on the allegations, that there were "no facts" to support a punitive damages award. Here, in contrast, the terms of the LDCs establish that Panasonic is not liable to Plaintiffs for punitive damages.

Accordingly, Plaintiffs may not recover from Panasonic consequential damages (i.e., lost advertising revenues and payments to third parties) or punitive damages.

### Conclusion

For the reasons stated above, Panasonic's motion is GRANTED. The Clerk of Court is respectfully directed to close the motion docketed at ECF No. 81.

**SO ORDERED.**

Dated:     New York, New York
           May / / , 2018

_____
                    John F. Keenan
          United States District Judge