# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MEDIA GLOW DIGITAL, LLC and TIMES
SQUARE LED, LLC,

                             *Plaintiffs*,

     -against-

PANASONIC CORPORATION OF NORTH
AMERICA; ICON ARCHITECTURAL
GROUP, LLC; ICON ARCHITECTURAL
GROUP, PLLC; ICON HD, LLC; EARL B.
LOVELL – S.P. BELCHER, INC.; and NY
LAND SURVEYOR P.C.,

                       *Defendants*.

Civil Action No. 1:16-cv-07907 (PGG)

## PLAINTIFFS' TRIAL MEMORANDUM

KILPATRICK TOWNSEND &
STOCKTON LLP
Frederick L. Whitmer
Jonathan Polonsky
Cole B. Ramey (*admitted pro hac vice*)
Chad D. Hansen (*admitted pro hac vice*)
1114 Avenue of the Americas
New York, New York 10036

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 3

LEGAL ISSUES ....................................................................................................... 6

I.   Panasonic Breached the Millennium Agreement by Improperly Delegating Its Duties and Failing to Design, Construct, or Install a Sign that Fit Within Available Air Rights. ................................................................................................ 6

    A.   Panasonic Breached the Millennium Agreement By Delegating Its Duties to ICON and Remains Liable for Any Breach of the Agreement. .......................... 7

    B.   Panasonic Breached the Millennium Agreement by Failing to Design a Sign that Could Be Installed Within the Available Air Rights. ............................. 8

    C.   MGD Suffered Damages Due to Panasonic's Breach of the Millennium Agreement. ........................................................................................................ 10

II.   ICON Is Liable to MGD for Its Negligent Design, Construction, and Installation of the Millennium Sign. ..................................................................................... 12

    A.   ICON Owed MGD a Duty Because the Two Stood in the Functional Equivalent of Privity. ...................................................................................... 13

    B.   ICON's Performance Breached the Duties It Owed to MGD. .......................... 14

    C.   ICON's Breaches Proximately Caused MGD Harm. ...................................... 15

III.   Panasonic Breached the DoubleTree Agreement by Improperly Delegating Its Duties and Failing to Deliver a Good-Quality, Functioning Sign. ............................... 18

    A.   Panasonic Breached the DoubleTree Agreement By Delegating Its Duties to ICON and Remains Liable for Defendants' Numerous Breaches of Contract. ....................................................................................... 19

    B.   Panasonic Breached the DoubleTree Agreement By Failing to Provide a Good Quality LED Sign. ................................................................................... 20

    C.   MGD Suffered Damages Due to Panasonic's Breach of the Millennium Agreement. ........................................................................................................ 21

IV.   Panasonic Breached the Express Warranty in the DoubleTree Agreement by Failing to Repair the Numerous Defects in the DoubleTree Sign. ............................... 21

V.   ICON Is Liable to TSL for Its Negligent Performance in Constructing and Installing the DoubleTree Sign. ...................................................................................... 25

i

A.  ICON Owed TSL a Duty Because the Two Stood in the Functional Equivalent of Privity. .......................................................................... 25

B.  ICON's Performance Breached the Duties It Owed to TSL. .............................. 25

C.  ICON's Breaches Proximately Caused TSL Harm.............................................. 27

VI.  Panasonic's Breach of Contract Claim Against TSL Fails ........................................... 29

CONCLUSION ....................................................................................................................... 31

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Aktas v. JMC Dev. Co.*,
    877 F. Supp. 2d 1 (N.D.N.Y. 2012) ................................................................. 13

*Am. Elec. Power Co. v. Westinghouse Elec. Corp.*,
    418 F. Supp. 435 (S.D.N.Y. 1976) ................................................................. 24

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012) ................................................................. 13

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*,
    361 F. Supp. 2d 283 (S.D.N.Y. 2005) .................................................... 6, 19, 29

*Behrens v. Metro. Opera Ass'n, Inc.*,
    794 N.Y.S.2d 301 (N.Y. App. Div. 2005) ................................................ 17

*Bristol Village, Inc. v. La.-Pac. Corp.*,
    170 F. Supp. 3d 488 (W.D.N.Y. 2016) ................................................................. 24

*Cicorelli v. Capobianco*,
    453 N.Y.S.2d 21 (2d Dep't 1982) ................................................................. 28

*Collins v. Esserman & Pelter*,
    681 N.Y.S.2d 399 (3d Dep't 1998) ................................................................. 16

*Columbia Artists Mgmt., LLC v. Alvarez*,
    No. 08 Civ. 11254(LBS), 2011 WL 78119 (S.D.N.Y. Mar. 3, 2011) .............. 12

*Craig Test Boring Co. v. Saudi Arabian Airlines Corp.*,
    138 F. Supp. 2d 553 (S.D.N.Y. 2001) ................................................................. 16

*CVD Equip. Corp. v. Taiwan Glass Indus. Corp.*,
    No. 10-CV-573 (JPO), 2014 WL 6057395 (S.D.N.Y. Nov. 13, 2014) .............. 8

*F. Garofalo Elec. Co. v. New York Univ.*,
    754 N.Y.S.2d 227 (1st Dep't 2002) ................................................................. 31

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
    783 F.3d 395 (2d Cir. 2015) ................................................................. 13

*Hart v. Carro, Spanbock, Kaster & Cuiffo*,
    620 N.Y.S.2d 847 (2d Dep't 1995) ................................................................. 16

*Holland v. Fahnestock & Co.*,
    No. 01CIV.2462RMBAJP, 2002 WL 1774230 (S.D.N.Y. Aug. 1, 2002) .......... 9, 19

*In re Lavigne*,
    114 F.3d 379, 387 (2d Cir. 1997) ................................................................. 29

*Innovative Biodefense, Inc. v. VSP Techs, Inc.*,
    176 F. Supp. 3d 305 (S.D.N.Y. 2016) ................................................................. 29

*Jacob & Youngs, Inc. v. Kent*,
    230 N.Y. 239 (1921) ................................................................. 31

*Kohl v. Green*,
    651 N.Y.S.2d 744 (3d Dep't 1997) ................................................................. 15

*Korean Air Lines Co. v. McLean*,
    118 F. Supp. 3d 471 (2015) ................................................................. 28

*Nielsen Media Research v. Microsystems Software, Inc.*,
    No. 99 CIV. 10876(LAP), 2002 WL 31175213 (S.D.N.Y. Sept. 30, 2002) .......... 11

*Northrop v. Thorsen*,
    848 N.Y.S.2d 304 (2d Dep't 2007) ................................................................. 16

*Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*,
   73 N.Y.2d 417 (1989) ........................................................................................ 13

*RLI Ins. Co. v. King Sha Grp.*,
   598 F. Supp. 2d 438 (S.D.N.Y. 2009) .............................................................. 17

*Signature Health Ctr., LLC v. State*,
   28 Misc. 3d 543 (N.Y. Ct. Cl. May 20, 2010) ................................................. 17

*Silivanch v. Celebrity Cruises, Inc.*,
   171 F. Supp. 2d 241 (S.D.N.Y. 2001) .............................................................. 12

*Trs. of Columbia Univ. in City of N.Y. v. Gwathmey Siegel & Assoc. Architects*,
   574 N.Y.S.2d 668 (1st Dep't. 1991) ................................................................ 31

*United States v. TriStates Design Constr. Co.*,
   899 F. Supp. 916 (N.D.N.Y. 1995) .................................................................. 11

## <u>Statutes</u>

N.Y. C.P.L.R. § 1412 ............................................................................................ 28

N.Y. U.C.C. § 2-210(1) ............................................................................... 8, 9, 19

N.Y. U.C.C. § 2-711 .............................................................................................. 11

N.Y. U.C.C. § 2-713 ......................................................................................... 10, 11

N.Y. U.C.C. § 2-714(1), 2-714(2) ................................................................... 21, 24

N.Y. U.C.C. § 2-719(1) ......................................................................................... 24

Plaintiffs Media Glow Digital, LLC ("MGD") and Times Square LED, LLC ("TSL") (collectively, "Plaintiffs") by the undersigned counsel, respectfully submit this Trial Memorandum.

## PRELIMINARY STATEMENT

This case involves MGD's and then TSL's longstanding efforts to secure largescale LED advertising signs in Times Square, first at the Millennium Hotel (the "Millennium Sign") and, after that project failed because of Defendants' conduct, then at the DoubleTree Hotel (the "DoubleTree Sign"). To accomplish these goals, Plaintiffs contracted with Defendant Panasonic Corporation of North America ("Panasonic") for Panasonic to handle all aspects of the design, construction and installation of the state-of-the art LED signs. Plaintiffs selected Panasonic based on Panasonic's representations that it was a turnkey solution provider with the experience, resources, and ability to address the complex air rights issue present in construction projects in Times Square. Panasonic, in turn, delegated some its obligations to Defendants ICON Architectural Group, LLC, ICON Architectural Group, PLLC, and ICON HD LLC ("ICON") and others to Retop, a non-party Chinese manufacturer. After over seven years and Plaintiffs' combined expenditure of many millions of dollars, Plaintiffs never received a quality functioning sign in Times Square. Because of Panasonic's and ICON's inability and refusal to remedy this untenable situation, Plaintiffs brought this suit.

At trial, Plaintiffs will establish that Panasonic is separately liable to MGD for breach of contract and to TSL for breach of contract and breach of warranty for Panasonic's failure to deliver LED signs as promised. For its role in causing the failure of these projects, ICON is liable to each Plaintiff for negligence. As to the Millennium Sign project, MGD's primary complaint is that Panasonic failed to deliver a sign that could be installed within the air rights

1

available on the Millennium Hotel, notwithstanding that air rights was the very issue that Panasonic was retained to address. Rather than solving MGD's air rights issue, Panasonic and ICON relied on incomplete and inaccurate prior survey data without making any effort to determine whether the sign that ICON designed and Panasonic had constructed could be placed on the Millennium Hotel. When the sign was ready to be installed on the Millennium Hotel, a neighboring property owner informed MGD that the sign could not be installed without encroaching the neighbor's air rights. As a result, the Millennium Sign project failed altogether, causing substantial damage to MGD.

At the time that the Millennium Sign project was failing, some of MGD's indirect owners were forming Plaintiff TSL to place a large-scale LED sign on the DoubleTree Hotel. Once the Millennium Sign project failed, and in an effort to salvage the years of effort and substantial cost that MGD incurred in pursuing the Millennium Sign, TSL agreed to purchase for use on the DoubleTree Hotel the sign that Panasonic and ICON had designed and constructed for the Millennium Hotel. In the contract TSL and Panasonic entered into for the DoubleTree Sign project, Panasonic agreed to provide TSL with a high-quality LED Sign on the DoubleTree Hotel free of defects in materials and workmanship. Despite ICON's poor performance on the Millennium Sign, and over TSL's protest, Panasonic again delegated its duties to ICON. ICON's incompetence caused substantial delays in the construction and installation of the DoubleTree Sign, which, due to ICON's negligence, had unsightly gaps between the Sign's panels that negatively affected TSL's ability to sell advertising on the Sign. In addition, ICON's handling of the LED sign during installation contributed to or caused defects and failures of the DoubleTree Sign, which became apparent when the Sign was finally installed and proved to be neither of high quality nor free of defects in materials and workmanship. The DoubleTree Sign suffered

2

from a litany of defects that substantially impaired TSL's ability to achieve the level of advertising revenue that should have been earned on a sign that functioned properly. Despite Panasonic's ongoing attempts to repair the Sign for years after declaring its work to be complete, it was never able to fully repair the defects and deliver the sign to TSL that had been promised. In March 2019, after the DoubleTree Hotel decided to reface its building, the DoubleTree Sign was removed from the hotel, disassembled, and thrown into the dumpster.

Panasonic's breach of the Millennium Agreement, its breach of the DoubleTree contract and warranties, and ICON's negligent work on both projects has caused each of Plaintiffs MGD and TSL substantial damages for which Defendants are liable.

## FACTUAL BACKGROUND

**The Millennium Sign:**

In 2009, MGD purchased the lease rights to construct and operate a sign on the Millennium Hotel in Times Square. MGD worked with several different manufacturers and installers to attempt to place a sign on the Millennium Hotel, before realizing that it needed an experienced company to assist with the project, particularly the issue of designing a sign that would fit within the Millennium Hotel's limited air space. [Dkt. 175 at ¶¶ 33-36, 39-40, 47-51]. Following these failed efforts, MGD engaged Panasonic for the project in 2011 based on Panasonic's representations that it was a "solutions company" with substantial experience in such projects that could address the critical issue of designing, constructing, and installing a sign that could fit on the Millennium without infringing the neighboring property's air rights. MGD and Panasonic signed a contract for Panasonic's promised turnkey "solution," which obligated Panasonic to design, construct, and install all aspects of the Sign and contained no exceptions,

3

disclaimers, or other language placing responsibility on anyone but Panasonic for the crucial air rights issues.

Despite contractual prohibitions and without MGD's consent, immediately after contracting with MGD, Panasonic (i) subcontracted the manufacturing of the Millennium Sign to a Chinese provider (Retop), (ii) subcontracted the Sign's installation and construction to Defendant ICON, a North Dakota firm that had never worked in Times Square or with the type of curtain-wall sign installation being designed for MGD, and (iii) posited itself as the *de facto* general contractor of the Millennium Sign project. Unbeknownst to MGD, Panasonic itself had no solution to address the air rights issues, and no experience, personnel, or capability to do the work it had promised.

Panasonic's and ICON's inexperience and incompetence plagued the Millennium project from its inception, and Panasonic and ICON were ultimately unable to design and construct a sign that fit within the available air rights at the Millennium Hotel. Early in the project, a former MGD independent contractor provided Defendants with an informal set of air rights data and an incomplete air rights survey. Panasonic and ICON acknowledged (between themselves) that the information was insufficient to enable them to determine the available air rights on the Millennium Hotel or whether the Millennium Sign would fit within the hotel's existing air rights. Yet, Panasonic and ICON admittedly took no steps to verify the air rights available; they performed no studies, surveys, or other diligence of the air rights. And, the sign as designed by ICON did not even fit within the air rights data provided by MGD's independent contractor. As a result, MGD was forced to abandon the Millennium Sign project in October 2013 when the parties discovered that the Sign that ICON designed could not be installed without infringing upon the very air rights for which Panasonic had earlier promised a solution. This occurred only

4

*after* MGD paid $1.6 million to renew its lease at the Millennium Hotel in September 2013 and had incurred other significant expenses, all in reliance on Panasonic's contractual promises.

**The DoubleTree Sign:**

Having failed miserably with its promised Millennium "solution," Panasonic induced Plaintiffs to relocate the Millennium Sign – being stored in Panasonic's warehouse – to the DoubleTree Hotel. It did so by offering MGD a $2 million credit toward installation of a different sign on the Millennium Hotel and representing to TSL (a new entity comprised of some MGD principals) that the Millennium Sign would be appropriate for the new location and have a display as good as neighboring signs. Panasonic contractually promised TSL that it would install the Sign at the DoubleTree Hotel within three to four months. TSL agreed and purchased the Panasonic "credit" from MGD, which it then applied to the purchase of the Sign from Panasonic for installation at the DoubleTree Hotel. Despite deeply criticizing ICON's work on the Millennium Sign project, Panasonic again subcontracted all the work to ICON.

Again, Panasonic's and ICON's incompetence and lack of experience doomed the project. Despite the promises made to TSL that final completion would be achieved by June 2015, Panasonic's and ICON's own documents show that they could not possibly deliver the DoubleTree Sign on the promised schedule. When Panasonic and ICON delivered the sign four months late, it became apparent that the Retop sign designed by ICON was inappropriate for the DoubleTree location and utterly defective. The Sign experienced numerous defects and continuous failures that required ongoing repairs, issues for which ICON's handling of the Sign was a substantial cause.

Despite the DoubleTree Sign's continuous failures and defects, Panasonic declared the Sign to be "substantially complete" in October 2015 and "finally complete" in December 2015.

Panasonic's own documents show that it acknowledged over the following months that its sign was experiencing abnormal, near-daily failures, was nowhere near finally complete, and might need to be entirely replaced. These defects continued for years after "final completion" of the Sign, notwithstanding Panasonic's numerous attempts to make warranty repairs to the Sign. Then, despite the Sign's ongoing, unacceptable failure rate, Panasonic unilaterally determined, without any supporting diagnosis or facts, that the DoubleTree Sign had "stabilized," and demanded final payment from TSL in April 2016.

The Sign continued to fail during the course of this litigation and its fundamental defects were never remedied, creating a stigma over the Sign that discouraged advertisers and prevented TSL from realizing millions of dollars in expected advertising revenue and profits from the Sign. In March 2019, after the DoubleTree Hotel decided to reface its building, the DoubleTree Sign was removed from the hotel, disassembled, and scrapped.

## LEGAL ISSUES[1]

### I.     <u>Panasonic Breached the Millennium Agreement by Improperly Delegating Its Duties and Failing to Design, Construct, or Install a Sign that Fit Within Available Air Rights.</u>

A breach of contract claim under New York law, "requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 290 (S.D.N.Y. 2005) (citation omitted). Panasonic concedes that it entered into a contract to design, construct, and install a large-scale LED sign on the Millennium Hotel. [Dkt. 175 at ¶ 82]. Evidence and testimony to be adduced at trial will prove that Panasonic materially breached the contract by

---

[1] Plaintiffs' objections to the Magistrate Judge's denial of their motion to amend their complaint to assert a gross negligence claim against Panasonic are *sub judice*. If the Court grants Plaintiffs' objections, Plaintiffs request that they be given an opportunity to amend their trial memorandum to address the legal issues likely to arise at trial based on amendments to the complaint.

delegating its responsibilities to Retop and ICON and failing to design, construct, or install a sign within the Millennium Hotel's available air rights, thereby damaging MGD in the amount of payments made to Panasonic.

It is undisputed that on December 5, 2011, MGD and Panasonic signed a written contract for Panasonic's promised turnkey "solution," with a total contract price of $4,183,296.73 (the "Millennium Agreement").[2] [Dkt. 171-1 at pp. 18-32 ("Millennium Agreement")]. The Millennium Agreement obligated Panasonic to design, construct, and install all aspects of the Millennium Sign. [*See id.* ¶ 1.1]. In doing so, Panasonic agreed to (1) follow state and local codes during the installation process [*id.*] and (2) design and construct a good quality sign that met the contract requirements and, most importantly, fit within the Millennium Hotel's available air rights [*id.* ¶¶ 1.0-1.2, Ex. A, ¶ 2.2]. The contract contained no exceptions, disclaimers, or other language that placed responsibility for the crucial air rights issues on anyone but Panasonic. [*Id.* Ex. A, ¶ 9.8].

## A. Panasonic Breached the Millennium Agreement By Delegating Its Duties to ICON and Remains Liable for Any Breach of the Agreement.

Rather than fulfilling its obligations, and initially unbeknownst to MGD, Panasonic delegated the Sign's design, construction, and installation to ICON, which had no experience designing and installing a large-scale mesh LED sign in Times Square, much less with air rights issues. [Dkt. 172-2, Kuntz Dep. 31:20-32:17, 52:25-53:13, 81:6-18, 90:14-91:24, 114:6-9]. Panasonic also delegated manufacturing to Retop, a Chinese manufacturer. [Dkt. 175 at ¶ 167]. These delegations breached the Millennium Agreement, which provided that "[n]either this

---

[2] MGD and Panasonic subsequently executed a Modification Agreement [Dkt. 171 at 34-35], letter agreement [*id.* at 37-38], and change order [Dkt. 171-1 at 134-35] that altered the schedule and payment and other terms.

Agreement nor the obligation of either Party to perform hereunder shall be assigned or delegated by one Party without the other Party's written consent, except that Panasonic may assign to affiliated companies without consent." [Millennium Agreement Ex. A, ¶ 9.8].

Even if the Millennium Agreement did not prohibit delegation, a party cannot delegate its contractual duties where "the other party has a substantial interest in having his original promisor perform or control the acts required by the contract." N.Y. U.C.C. § 2-210(1).[3] MGD had a substantial interest in having Panasonic perform under the Millennium Agreement, having selected Panasonic based on its reputation and its representations that it is a "solutions company" with the experience and resources to solve the problems that previously hindered the project, including the critical air rights issue. [Dkt. 149 at ¶¶ 2-5]. Panasonic assured MGD that it would handle the air rights issue as part of its "solution" and that it could build a sign to fit within the available air rights. [*Id.* ¶ 5]. Thus Panasonic's delegations were themselves a breach of contract.

**B.    Panasonic Breached the Millennium Agreement by Failing to Design a Sign that Could Be Installed Within the Available Air Rights.**

Panasonic breached the Millennium Agreement by failing to address the air rights issue and to design and construct a sign that fit within the air rights on the Millennium Hotel, which caused the project's failure and significant losses for MGD. Panasonic and ICON were aware from the start of the Millennium Sign project that the limited air rights and the depth of the Sign were critical issues that Panasonic had agreed to solve. Panasonic's Senior Solutions Manager, Barry Belsky, observed no later than June 8, 2011 that "air rights in NYC are a huge issue and

---

[3] The U.C.C. applies to the Millennium Agreement as it was predominately for the purchase of a large-scale LED sign. *CVD Equip. Corp. v. Taiwan Glass Indus. Corp.*, No. 10-CV-573 (JPO), 2014 WL 6057395, at *4-5 (S.D.N.Y. Nov. 13, 2014) (contract to design, manufacture, and install chemical vapor deposition system for defendant's factory was predominately for the sale of goods).

you can't just be close." [Dkt. 171-3, Ex. 94]. Panasonic agreed to perform a detailed site survey of the Millennium Hotel to determine all of the information necessary to design and install the Millennium Sign within the available air rights. [Millennium Agreement ¶ 1.1]. Nonetheless, Panasonic and ICON have each admitted they did not understand the pre-existing air rights survey results. [*E.g.*, Dkt. 171-2, Ex. 55]. Panasonic and ICON punted the air rights issue back and forth between themselves, passing the buck in willful blindness to obvious air rights problems. They warned each other that certain previously provided building measurements were wrong, that information contained in pre-existing air rights surveys was incomplete, and that "exact dimensions" were needed to accurately design the Millennium Sign and prepare the "final engineered attachment drawings." [Dkt. 171-2, Exs. 53, 56]. ICON warned Panasonic that it needed to ensure the measurements in the incomplete surveys were proper. [*Id.* Exs. 52, 56].

Yet, neither company did anything to investigate the available air rights.[4] The Millennium Sign was 140 feet tall. [Millennium Agreement ¶ 1]. MGD's independent contractor, Isaac Montanya, provided Defendants with a spreadsheet showing that the available air space on the Millennium Hotel (1) differed on the left and right side of the facade on which the Sign was to be installed and (2) decreased for lower floors of the Millennium Hotel. [Dkt. 171-3, Ex. 70]. This information showed that the left side of the hotel had only 3 ½ inches of air space at the 27th floor and 3 ¼ inches of air space at the 22nd floor—floors on which the Sign was to be installed. [*Id.*]. Despite receiving this clear information showing that there was less than 3 ¾

---

[4] Even if Panasonic were permitted to delegate its duties, its delegation to Retop and ICON does not relieve Panasonic of its duty to perform or for any liability for breach. N.Y. U.C.C. § 2-210(1); *Holland v. Fahnestock & Co.*, No. 01CIV.2462RMBAJP, 2002 WL 1774230, at *8 (S.D.N.Y. Aug. 1, 2002) ("The act of delegation . . . does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable." (citation omitted)).

inches of available air space for portions of the Sign, Panasonic and ICON continued to design the Sign to be 3 ¾ inches thick for its entire length.[5]

As a result of Panasonic's (and its delegate ICON's) failure to verify the available air rights or to design and construct a sign that complied with the air rights restriction, the Sign could not legally be installed on the Millennium Hotel. On October 25, 2013, counsel for the owner of a neighboring property sent MGD a letter informing it that the Sign as designed would infringe the neighbor's air rights and constitute trespass. [Dkt. 171-1, Ex. 174]. MGD was forced to abandon the project after Panasonic failed to identify a viable option for proceeding with an LED sign at the Millennium Hotel and MGD lost its lease at the hotel. These breaches of contract caused MGD to suffer significant losses in the form of payments made to Panasonic under the Millennium Agreement.

## C.     MGD Suffered Damages Due to Panasonic's Breach of the Millennium Agreement.

Where a seller fails to deliver goods, section 2-713 of the New York U.C.C. allows recovery of "the difference between the market value at the time when the buyer learned of the breach and the contract price . . . , but less expenses saved in consequence of the seller's breach." Thus MGD is entitled to recover the $2,998,000 it paid to Panasonic under the Millennium Agreement,[6] along with statutory prejudgment interest from the date of the breach.

---

[5] Panasonic was also informed by Mr. Montanya that North Shore Neon, which had been retained to install a sign on the Millennium Hotel during MGD's earlier efforts before Panasonic's involvement, needed to remain the installation subcontractor if an air rights waiver would need to be obtained from the neighboring property owner, Bow Tie Partners. Nonetheless, Panasonic and ICON replaced North Shore Neon with another subcontractor, foreclosing the possibility that the Sign could be installed even if it encroached on neighboring air rights.

[6] MGD wired the following payments to Panasonic: $100,000 on February 12, 2012; $798,000 on March 30, 2012; $1,200,000 on June 22, 2012; and $900,000 on February 28, 2013.

Panasonic, after it breached its contract with Media Glow, gave a $2,000,000.00 "credit" to MGD to be used by MGD toward the installation of a different sign on the Millennium Hotel. Plaintiff TSL purchased that $2,000,000.00 credit from MGD, and TSL applied that credit to its purchase of the LED sign from Panasonic for the DoubleTree Hotel. Panasonic contends MGD's damages should be offset by this "credit." However, N.Y. U.C.C. § 2-711 provides that MGD is entitled to recover "so much of the price as has been paid" *and* (b) recover damages for non-delivery as provided under § 2-713. *See United States v. TriStates Design Constr. Co.*, 899 F. Supp. 916, 922-23 (N.D.N.Y. 1995) ("Under the N.Y.U.C.C., a buyer's claim for damages for non-conforming goods is separate and apart from its indebtedness for the purchase price."). Consistent with its express language, the "price as has been paid" in N.Y. U.C.C. § 2-711 includes all amounts that have been paid by MGD. *See Nielsen Media Research v. Microsytsems Software, Inc.*, No. 99 CIV. 10876(LAP), 2002 WL 31175223, at *12 (S.D.N.Y. Sept. 30, 2002). Under N.Y. U.C.C. § 2-713, MGD is entitled to recover "the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article, but less expenses saved in consequence of the seller's breach." Of course, MGD's otherwise statutory right to incidental and consequential damages is addressed by the contract provision in the Millennium Agreement excluding incidental and consequential damages.

Regardless, the $2 million credit is not relevant to, and does not reduce MGD's claim for damage under N.Y. U.C.C. § 2-711 and § 2-713 because it does not fall within either measure of damages – it did not actually reduce the "amount paid" by MGD pursuant to the Millennium Agreement, it is not part of the market price or the contract price, and is not an "expense saved" as a result of Panasonic's failure to deliver. "Saved expenses must be costs or expenditures

11

which would be anticipated had there been no breach." *Columbia Artists Mgmt., LLC v. Alvarez*, No. 08 Civ. 11254(LBS), 2011 WL 78119, at *3 (S.D.N.Y. Mar. 3, 2011) (internal quotations and citation omitted). MGD certainly did not anticipate having to pay an additional $2 million for a *separate sign* if Panasonic had complied with its contract and provided a sign that could be installed within the air rights of the Millennium Hotel.

Instead, the $2 million credit applies to a separate transaction between MGD and Panasonic, like a retail coupon given upon checkout and good only for future purchases. If a consumer, upon spending $100 on clothing, gets a retail coupon for $10 off his next purchase, he still paid $100 for the clothing. The $10 coupon has value but does not affect what is paid. Similarly, Panasonic's "credit" toward a new sign for the Millennium Hotel did not reduce the amount MGD actually paid to Panasonic on that project. Because but for an exclusion in the Millennium Agreement, Media Glow would be able to recover incidental and consequential damages as a result of Panasonic's breach (which far exceed the $2 million credit), Media Glow's failure to reduce its damages for this "credit" is not unjust and is in fact warranted.[7]

## II.    ICON Is Liable to MGD for Its Negligent Design, Construction, and Installation of the Millennium Sign.

To recover on a negligence claim under New York law, a plaintiff must establish: (1) that defendant owed plaintiff a duty; (2) a breach of that duty; (3) proximate causation of the plaintiff's injury; and (4) damages. *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 252 (S.D.N.Y. 2001). The evidence and testimony adduced at trial will show that (1) ICON owed

---

[7] MGD is not contending that the $2 million credit is never to be accounted for in its damages, because MGD cannot recover more than its actual losses on its combined claims against Panasonic and ICON. But it is clear under the UCC that the credit does not reduce the amount MGD "paid" to Panasonic and, therefore, Panasonic is not entitled to a reduction for the amount of the credit.

MGD a duty because they stood in the functional equivalent of privity; (2) ICON breached its duty of care by knowingly relying on incomplete and deficient air rights information, failing to take any action to independently verify the available air rights, and proceeding to design and construct the Millennium Sign without confirming the available air rights; and (3) ICON's failures proximately caused the Millennium Project's failure, which caused MGD significant damages.

### A.     ICON Owed MGD a Duty Because the Two Stood in the Functional Equivalent of Privity.

ICON owed MGD a duty of care because it undertook to perform work for MGD's benefit and knew that MGD would be relying on it to perform tasks for the Millennium Project with due care. As a result, ICON and MGD stood in the functional equivalent of privity, which gives rise to ICON's duty to MGD.

"A viable tort claim against a professional requires that the underlying relationship between the parties be one of contract or the bond between them so close as to be the functional equivalent of contractual privity." *Aktas v. JMC Dev. Co.*, 877 F. Supp. 2d 1, 26 (N.D.N.Y. 2012) (quoting *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 419, 539 N.E.2d 91 (1989)). Under New York law, the functional equivalent of privity exists where (1) the defendant was aware that its work would be used for a particular purpose; (2) a third party known to the defendant relied on defendant in furtherance of that purpose; and (3) "some conduct by the defendant link[s] it to that known third party evincing the defendant's understanding of the third party's reliance." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 405-06 (2d Cir. 2015) (quoting *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 59 (2d Cir. 2012)).

ICON and MGD stood in the functional equivalent of privity, which gives rise to a duty of care.[8] As stated by Judge Keenan in his May 29, 2019 Order, and as acknowledged in this Court's March 24, 2020 Order:

> ICON does not appear to contest[] that "Plaintiffs have presented evidence establishing that (1) ICON was fully aware the LED sign was being manufactured for Plaintiffs' benefit, (2) Plaintiffs relied on the services being provided by ICON, and (3) ICON apprised Plaintiffs of the status of the project and sent them updated schedules for the completion of the signs."

[Dkt. 228 at 10 (quoting Dkt. 215 at 15)]. ICON knew its work on the Millennium Sign was for MGD's benefit. Early in their communications, Panasonic told ICON that Panasonic was bidding on another project and referenced its "customer," i.e., MGD. [Dkt. 171-3, Ex. 64; Dkt. 171-2, Ex. 51 (identifying the customer as MGD)]. ICON knew MGD was relying on ICON in furtherance of the Millennium Project—ICON was in direct communication with MGD and regularly provided MGD with details and updates for the design, construction, and installation process. [Dkt. 149 at ¶ 16-20; Dkt. 171-2, Ex. 11, 254:21-255:16]. This evidence establishes that MGD and ICON stood in the functional equivalent of privity such that ICON owed MGD a duty of care.

## B.    ICON's Performance Breached the Duties It Owed to MGD.

ICON knew from the outset that the air rights were key to the Millennium Project. [Dkt. 171-2, Ex. 11 at 84:13-23, Ex. 52]. ICON was significantly involved in the review and analysis of preliminary air rights documents provided by MGD and knew that, not only could it not properly interpret the information, but that the information was insufficient to determine the available air rights. [*Id.* Exs. 55-56]. Yet, ICON did nothing to measure or otherwise verify the air rights available on the Millennium Hotel. [Dkt. 171-2, Ex. 11 at 88:25-89:14]. Instead, ICON

---

[8] For this same reason, MGD's negligence claim is not barred by the economic loss doctrine. [*See* Dkt. 228 at 5 & n.4; Dkt. 215 at 15-16].

proceeded to design and construct the Sign using information it could not understand and that it knew to be deficient. [*Id.* at 115:16-120:11]. Such conduct is plainly an unreasonable breach of the duty of care that ICON owed to MGD.

ICON may attempt to defeat MGD's negligence claim by arguing that expert testimony is required to establish a claim for ordinary negligence because ICON is a professional. [Dkt. 217 at 8; Dkt. 234-1 at 7-8]. However, expert proof is not needed to establish a professional's simple negligence where "neither specialized knowledge nor expert testimony is necessary to determine whether due care was exercised." *Kohl v. Green*, 651 N.Y.S.2d 744, 745, 235 A.D.2d 671, 672-73 (3d Dep't 1997) (where defendant-engineer contracted to inspect a roof, expert testimony was not required for the jury to determine whether defendant breached a duty of reasonable care by failing to notice an obvious and substantial leak in the roof).

ICON's utter failure to address the air rights issue or to design and construct a sign that fit within the available air rights is the type of failure that does not require expert proof to establish breach of duty. This Court previously recognized as much, stating that "whether ICON was responsible for obtaining proper air space measurements . . . may be [an] issue[] that can be resolved by a lay jury without expert testimony . . . .'" [Dkt. 228 at 11 (quoting Dkt. No. 195 at 64)]. MGD will thus be able to present evidence that ICON breached its duty of care without resort to expert testimony – ICON's deficient performance is so plainly in violation of the duties it owed MGD that the jury can evaluate the conduct without special knowledge.

### C.   ICON's Breaches Proximately Caused MGD Harm.

Under New York law, a breach of duty is the proximate cause of an injury if "the defendant's negligence was a substantial foreseeable factor in bringing about his or her injury." *Craig Test Boring Co. v. Saudi Arabian Airlines Corp.*, 138 F. Supp. 2d 553, 557 (S.D.N.Y.

2001); *see also Maheshwari v. City of New York*, 2 N.Y.3d 288 (2004) ("To establish a prima facie case of proximate cause, a plaintiff must show 'that the defendant's negligence was a substantial cause of the events which produced the injury'" (citation omitted)).

ICON's conduct in designing and constructing the Millennium Sign using air rights information it knew to be deficient, and without taking any action to obtain complete and accurate information, was a pivotal cause of the Millennium Project's failure. The project's failure caused MGD substantial losses. ICON is not entitled to a reduction of MGD's damages based on apportionment of fault to MGD, because MGD's conduct did not contribute to its own injury. A professional that is hired to perform work because of its superior knowledge cannot shift responsibility to the plaintiff for a professional's breach of duty absent a showing that the plaintiff impeded the defendant's ability to fulfill its duty. *See Northrop v. Thorsen*, 848 N.Y.S.2d 304, 309, 46 A.D.3d 780, 783-84 (2d Dep't 2007) (defendant cannot attribute its own inaction to any culpable conduct by the plaintiff where defendant knew corrective action was needed but failed to take any such action); *Hart v. Carro, Spanbock, Kaster & Cuiffo*, 620 N.Y.S.2d 847, 849, 211 A.D.2d 617, 619 (2d Dep't 1995) (a professional with superior knowledge cannot shift to plaintiff a duty that the professional was specifically hired to undertake); *see also Collins v. Esserman & Pelter*, 681 N.Y.S.2d 399, 256 A.D.2d 754, 757 (3d Dep't 1998) (application of comparative fault not warranted where plaintiff's conduct, although arguably negligent, did not impede defendants' ability to complete the review they were hired to perform). Thus, ICON, having been retained by Panasonic because it is a licensed architect, cannot shift to MGD responsibility for the air rights problem that Defendants were hired to solve.

Nor can ICON show that any conduct of MGD proximately caused ICON's utter failure to confirm that the Sign it designed would fit within available air rights. ICON's unreasonable

conduct in designing the Sign to be 3 ¾ inches thick, knowing that the available air rights were less than 3 ¾ inches, caused the failure of the Millennium Project. MGD was ultimately forced to abandon the project upon learning that the sign ICON designed would infringe on a neighboring property owner's air space. Thus, MGD's losses in pursuing the project were proximately caused by ICON's failure to account for the limited air rights in designing the Millennium Sign.

A plaintiff who establishes negligence is entitled to recover compensatory damages, including the amount of economic loss directly caused by the defendant's negligence. *Signature Health Ctr., LLC v. State*, 28 Misc. 3d 543, 560 (N.Y. Ct. Cl. May 20, 2010) (citation omitted) ("The person responsible for the injury must respond for all damages resulting directly from and as a natural consequence of the wrongful act . . . whether the damages could or could not have been foreseen by him."); *Behrens v. Metro. Opera Ass'n, Inc.*, 794 N.Y.S.2d 301, 303, 18 A.D.3d 47, 50 (N.Y. App. Div. 2005) ("In tort actions, an injured plaintiff may recover from the defendant all damages directly flowing from and as a natural consequence of the wrongful act, so long as the damages may be ascertained with reasonably certainty."). Where the act of negligence results in lost profits, they are recoverable. *RLI Ins. Co. v. King Sha Grp.*, 598 F. Supp. 2d 438, 446 (S.D.N.Y. 2009) (permitting recovery of consequential damages and lost profits arising out of a subcontractor's negligence that increased project costs and caused considerable project delays).

Here, MGD is entitled to recover as a proximate cause of ICON's negligence $4,183,296.73 as lost value of the Millennium Sign, $3,314,342.97 in compensatory damages and $15,966,102.33 in lost profits, along with statutory prejudgment interest.

17

III.    **Panasonic Breached the DoubleTree Agreement by Improperly Delegating Its
        Duties and Failing to Deliver a Good-Quality, Functioning Sign.**

The evidence and testimony adduced at trial will establish each of the elements required for TSL to prove that Panasonic is liable to it for breach of contract. TSL will prove that: (1) pursuant to a written contract, Panasonic agreed to provide and install a fully operational LED sign on the DoubleTree Hotel; (2) TSL made all payments required under the contract as amended until its performance was excused by Panasonic's material breaches; (3) Panasonic materially breached the contract by delegating its responsibilities and failing to deliver a good quality LED sign within contract specifications; and (4) TSL was thereby damaged in the amount of payments made to Panasonic along with other out-of-pocket expenses and lost profits.

The existence of a valid contract between TSL and Panasonic is undisputed. After failing to deliver its promised "solution" for the Millennium Sign, Panasonic induced TSL to relocate the Millennium Sign to the DoubleTree Hotel.[9] [Dkt. 149 at ¶ 29]. Panasonic and TSL extensively discussed whether the Millennium Sign was suitable for the DoubleTree location. [Root Dep. 13:3-9]. Panasonic assured TSL that the Sign would not sacrifice in quality when installed at this new location and would have a display as good in quality and performance as neighboring Times Square signs. [*Id.* 13:10-12; Dkt. 149 at ¶ 30]. Based on these representations, TSL contracted with Panasonic as of June 8, 2014 for Panasonic to provide a good quality, fully operational LED sign on the DoubleTree Hotel. [Dkt. 171-1 at 40-56 ("DoubleTree Agreement")].

TSL made all of the payments to Panasonic required under the parties' agreement until it became clear that Panasonic could not remedy the significant defects in the DoubleTree Sign.

---

[9] MGD's members who wished to continue pursuing a Times Square sign project formed Plaintiff TSL. [Root Dep. 13:13-22].

Because Panasonic's material breaches of contract excuse TSL's performance, TSL will establish that it has not breached the DoubleTree Agreement by failing to pay the full contract price to Panasonic. *Bear, Stearns Funding, Inc.*, 361 F. Supp. 2d at 291.

    A.    **Panasonic Breached the DoubleTree Agreement By Delegating Its Duties to ICON and Remains Liable for Defendants' Numerous Breaches of Contract.**

As with the Millennium Sign, Panasonic delegated its duties to construct and install the DoubleTree Sign to ICON, despite TSL's objections and despite Panasonic's admissions that ICON performed incompetently on the Millennium Sign. [Dkt. 149 at ¶ 31]. As with the Millennium Agreement, the DoubleTree Agreement prohibits Panasonic from assigning or delegating its contractual duties without TSL's written consent. [DoubleTree Agreement, Ex. A ¶ 12.8]. Thus, Panasonic's delegation to ICON was itself a breach of the DoubleTree Agreement. *See supra* Part I.A. Even if the delegation were not a breach, Panasonic remains liable for its obligations under the agreement. N.Y. U.C.C. § 2-210(1); *Holland*, 2002 WL 1774230, at *8.

Unsurprisingly, ICON's and Panasonic's performance on the DoubleTree Project was again riddled with errors that caused significant delays: Panasonic admits that ICON did not achieve a level of performance needed to meet its installation schedule, or even to provide weekly status reports to TSL; ICON consistently provided late reports to independent architects and engineers for peer review; late and improper construction and scaffolding permits also caused undue delays; construction methods did not pass initial peer review and had to be changed; construction logs were not properly kept, causing a failed inspection; noncompliant drills were used to install clamps; and caulking material was not pre-approved. The litany of non-compliant construction and installation methods delayed the DoubleTree Sign schedule by months.

Once the Sign was installed and powered on in October 2015—four months after the promised installation date—it became evident that Panasonic had not properly supervised installation. The Sign had unacceptably large gaps between panels, which Panasonic acknowledged "should have [been] done . . . correctly the first time." [Dkt. 171-3, Ex. 63]. On July 22, 2016, Panasonic acknowledged that the Sign still had "very visible vertical seams," which had not been corrected by ICON or the installer. [Benike Dep. Ex. 21]. Panasonic remains liable for these breaches, notwithstanding that the work was performed by subcontracted parties.

**B.** **Panasonic Breached the DoubleTree Agreement By Failing to Provide a Good Quality LED Sign.**

Despite Panasonic's assurances that the Millennium Sign—designed for the west-facing side of the Millennium Hotel—was appropriate for the DoubleTree Hotel, the Sign did not display well on south-facing wall of the DoubleTree Hotel, which received direct sunlight. [Dkt. 172 at ¶ 30; Dkt. 171-6, Ex. 136]. In addition, Panasonic (and ICON) failed to ever properly install the Sign and bring it to an acceptable level of performance. The DoubleTree Sign has been (and continued during discovery in this suit) to be riddled with significant defects.

From the time the Sign was first turned on until as recently as March 2018, the Sign was plagued with defects such as outages, white spots, dark spots, blinking lights, and discolored LED strips. [*Infra* Part IV]. Panasonic admitted the Sign was "unacceptable for any customer providing the number of outages and visible seams" and noted the continued "major outages." Thus, Panasonic breached the DoubleTree Agreement by failing to deliver a good quality, functioning LED sign.

After Panasonic declared "final completion" on December 2, 2015, TSL seasonably notified Panasonic within a reasonable time that the Sign did not conform to the contract by sending Panasonic a memorandum on December 14, 2015, explaining that the Sign still suffered

from defects, including numerous LED strips failing to illuminate. [Dkt. 171-3, Ex. 82; Dkt. 171-7, Ex. 157].

      **C.**     **MGD Suffered Damages Due to Panasonic's Breach of the Millennium Agreement.**

Under N.Y. U.C.C. § 2-714(1), where the buyer has accepted the goods, the buyer may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable. Thus, TSL may recover for Panasonic's breach the difference between the contract price ($3,990,219.00) and the value of the Sign as received ($0), less the outstanding balance on the contract if found by the jury (claimed by Panasonic to be $1,990,219.00). In addition, statutory prejudgment interest runs from the date of the breach.

**IV.**     **Panasonic Breached the Express Warranty in the DoubleTree Agreement by Failing to Repair the Numerous Defects in the DoubleTree Sign.**

The evidence and testimony adduced at trial will establish that TSL relied on Panasonic's express warranty that the materials and equipment furnished by Panasonic would be of good quality, conform to the contract requirements, and be free from defects, and that Panasonic breached this warranty by providing a Sign that was riddled with defects that Panasonic could not repair for years after it was delivered to TSL.

Under the DoubleTree Agreement, Panasonic warranted that for two years after "substantial completion," the materials and equipment it furnished "will be of good quality" and "will conform to the requirements of the Contract Documents and will be free from defects." [DoubleTree Agreement ¶ 5, Ex. A ¶ 6.2]. Panasonic further warranted that during the warranty period, "the Integrated System [defined as the Signage and Related Equipment described in the Scope of Work and Plans and Specifications] will be free from defects in workmanship and

materials." [*Id.* Ex. A, ¶ 6.2]. In breach of this warranty, Panasonic delivered a sign that was neither free of defects in workmanship and materials nor of good quality, which continued to be true at least through March 2018 (the close of discovery in this litigation). The Sign's technical issues are not acceptable or normal for this type of sign. Thus, Panasonic never delivered a sign with the level of performance promised.

When the Sign was first powered up on October 29, 2015, at which time Panasonic declared that it achieved "substantial completion," the Sign was covered with outages, white spots, dark spots, blinking lights, and discolored LED strips. In November, 2015, Panasonic acknowledged the Sign did "not look great" and was having "many mechanical failures" [Benike Dep, Ex. 4] and that "we have had a lot of LED strip failures" [Dkt. 171-7, Ex. 156]. On December 17, after the alleged "Final Completion" of the Sign on December 2, 2015, Panasonic acknowledged "an unusually high number of early module failures." [Dkt. 171-5, Ex. 127]. Even ICON admitted that the Sign was a "mess" since being turned on. [Dkt. 171-2, Ex. 48].

These problems continued throughout 2016. In January 2016, Panasonic acknowledged that the Sign "was not repaired and stable." In February, Panasonic was "doing major repairs twice a week or so" and the Sign was still having performance problems. As of February 5, there were "daily failures." A few days later, Panasonic admitted the "amount of failure we are seeing are not 'normal' in the slightest" and that the Sign had an "'[a]bnormal' rate of failure." On February 9, Panasonic admitted the Sign "is having fairly serious product reliability and performance issues" and the "service team is not being successful in reducing the rate of failures." On March 10, Panasonic reiterated the "ongoing high rate of failure" and that it had "not seen any decline in the failure rate of this product since it was installed."

On April 4, Panasonic admitted the Sign was "unacceptable for any customer providing the number of outages and visible seams" and noted the continued "major outages." Six outages were experienced on one day and five outages less than two weeks later. On May 2, Panasonic reported a "major outage of at least 1/3 of the board that is dark" and that it was "still seeing outages on a weekly basis of approximately 10 per week." On July 1, Panasonic's service team noted issues with flickering LEDs, suggesting a trend of failures of bad strips. Its service manager noted that it would be optimistic to think the Sign would stabilize if all of the old LED strips could be replaced with new ones. On July 22, Panasonic acknowledged that "the display didn't perform like a normal display during the heavy sun daylight hours," and there were still "a handful of major service issues (outages & intermittent flashing strips)."

On November 20, more than a year after the Sign was first powered on, part of the Sign was inoperable, causing complaints from a new advertiser and Disney, an existing advertiser. Outages on other portions of the sign occurred on November 24 and 28. On December 4, more outages occurred; an LED strip was flashing down the right half of the Sign. A week later, on December 11, more outages occurred. The outages and defects that have persisted throughout the DoubleTree Sign's existence were still present on March 8, 2018. The defects were so extensive and pervasive, that the Sign was declared junk and thrown in the dumpster in March 2019 as part of the project to replace the façade on the DoubleTree Hotel.

The foregoing demonstrates why any argument by Panasonic that it has not breached the warranty because it has repaired all outages is misplaced. Despite Panasonic's continuous repairs, it was never able to completely repair the DoubleTree Sign. [Dkt. 175 at ¶ 446]. Additionally, Panasonic has admitted on numerous occasions that the Sign has not worked properly since it was powered on and that Panasonic has no way of knowing if the DoubleTree

Sign will ever be "100%." [*See id.* at ¶ 456]. Despite Panasonic deploying service personnel to the DoubleTree Sign nearly every week since October 2015, the same issues persisted. [*See id.* at ¶ 444].

Under N.Y. U.C.C. § 2-714(2), the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. Panasonic relies on the DoubleTree Agreement's limitation of damages. However, TSL contends that the evidence will show that the warranty failed of its essential purpose, allowing TSL to recover additional remedies available under Article 2 of the U.C.C. N.Y. U.C.C. § 2–719(1)(a) ; *Bristol Village, Inc.*, 170 F. Supp. 3d 488, 508 (W.D.N.Y. 2016). The price paid for the goods and "expenditures which are not incurred as a consequence of the breach, but were instead incurred before the breach occurred and in reliance on the contractual warranties, are recoverable as direct damages." *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 & n.44 (S.D.N.Y. 1976) ("[I]f the generator, as a unit, cannot or has not been repaired so as to meet contract specifications, and has not been replaced by a generator that can, the full purchase price of the generator may be recovered as damages by the plaintiff. Moreover, if plaintiffs' direct damages exceed this amount they may be recoverable as well, since the contract precludes the recovery of consequential damages only.").

Here, the value of the TSL Sign as warranted was the contract price ($3,990,219.00) and the value of the Sign as accepted was zero ($0), allowing TSL to recover the $3,990,219.00 difference. Moreover, TSL can recover "direct damages" incurred before the breach occurred and in reliance on the contractual warranties of $1,430,962.12. Statutory prejudgment interest runs from the date of breach on these damages.

24

**V.     ICON Is Liable to TSL for Its Negligent Performance in Constructing and Installing the DoubleTree Sign.**

The evidence and testimony adduced at trial will show that (1) ICON owed TSL a duty because they stood in the functional equivalent of privity; (2) ICON breached its duty of care by submitting untimely and error-laden construction reports, submitting late and improper permits, using improper construction methods that did not pass initial peer review, and failing to use compliant drills or to obtain pre-approval for the caulking material used to install the Sign; and (3) ICON's failures were the proximate cause of delays in constructing and installing the DoubleTree Sign, which caused TSL significant damages.

**A.     ICON Owed TSL a Duty Because the Two Stood in the Functional Equivalent of Privity.**

As with MGD, *supra* Part II.A, ICON owed TSL a duty of care because it undertook to perform work for TSL's benefit and knew that TSL would be relying on it to perform tasks for the DoubleTree Project with due care. As a result, ICON and TSL stood in the functional equivalent of privity, which gives rise to ICON's duty to TSL. Indeed, Judge Keenan found that evidence had been presented "establishing that (1) ICON was fully aware the LED sign was being manufactured for Plaintiffs' [including TSL's] benefit, (2) Plaintiffs relied on the services being provided by ICON, and (3) ICON apprised Plaintiffs of the status of the project and sent them updated schedules for the completion of the signs." [Dkt. 215 at 15].

**B.     ICON's Performance Breached the Duties It Owed to TSL.**

ICON's incompetence continued on the DoubleTree Sign project and establishes that ICON breached its duty of care. A litany of negligent work by ICON caused delays in constructing and installing the DoubleTree Sign, and its negligent handling of the Sign was a substantial contributing factor in the Sign's numerous defects.

25

ICON consistently submitted late or error-filled construction reports and logs that were required to be submitted to independent architects and engineers as part of the peer review process, causing numerous construction delays. ICON "failed to provide weekly reports or any timely information on the progress of [its] work on the Doubletree" to Panasonic. [Dkt. 171-2, Exs. 42-43]. ICON submitted late and improper construction and scaffolding permits. ICON's construction methods did not pass the initial peer review and needed to be changed. Construction logs were not properly kept and caused a failed inspection. Non-compliant drills were used in the clip installation process. Caulking material was not pre-approved. ICON's noncompliant construction and installation methods caused the DoubleTree Sign installation schedule to be pushed back months, and caused TSL to incur additional costs and suffer lost revenue. ICON admits that it knew TSL was relying on project information that ICON supplied, including project schedules, and that delays in the projects were costing TSL money.

ICON's negligent performance resulted in Panasonic providing ICON with a notice of non-compliance with its contract with Panasonic for the DoubleTree Sign on June 26, 2015. [Kuntz Dep. Ex. 51]. Panasonic raised that ICON had (1) missed scheduled installation milestones and had not presented a plan to remedy its delays; (2) performed work for the installation of sign anchors that was unacceptable to inspectors and did not comply with the construction requirements defined in the building permit; (3) failed to provide on-site supervision of subcontractors to ensure work was being performed in compliance with the schedule, plans, and specifications; (4) failed to submit reports or plans to remedy project delays. [Kuntz Dep. Ex. 51]. ICON was not aware if its work on the DoubleTree Sign complied with the construction requirements defined in the ICON building permit as of that time.

Apart from the costly delays caused by ICON's breaches of duty, ICON's poor construction methods caused the DoubleTree Sign to be installed in a defective and unsightly manner. ICON's installation left the Sign with large visible and unsightly gaps or "seams" between the installed panels that substantially affected its appearance and were left unaddressed for months. As Panasonic's project manager wrote on January 15, 2016, referring to these seams as "gaps" in the Sign, "[ICON's subcontractor] should have done the gaps correctly the first time . . . ." [Dkt. 171-3, Ex. 63]. Even when ICON purportedly finished its work, the DoubleTree Sign was in a state of such continuous failure that it was visibly substandard and immediately placed into continual ongoing warranty service despite its so-called "completion." [*Supra* Part IV]. In addition, ICON's careless handling of the Sign during the installation process contributed to or caused the ongoing defects and failures of the DoubleTree Sign.

### C.    ICON's Breaches Proximately Caused TSL Harm.

ICON's negligent construction and installation of the DoubleTree Sign was a substantial factor in causing project delays, the Sign's poor appearance, and the Sign's numerous defects and failures. Panasonic acknowledged that ICON's poor performance caused project delays. [Collins Dep. 44:20-46:5, 55:5-61:23]. The unsightly gaps and poor appearance that resulted from ICON's negligence also affected TSL's ability to sell advertising on the Sign. [Dkt. 171-4, Ex. 107]. And, analyses done to determine the cause of the Sign's failures and outages determined that the careless handling of the Sign during the installation process contributed to or caused the ongoing defects and failures of the DoubleTree Sign. Because ICON's negligent construction and installation methods caused delays and defects in the Sign, TSL is entitled to recover from ICON damages for additional costs that it incurred as well as lost revenue.

ICON is not entitled to a reduction in the damages for which it is liable based on any conduct of TSL. *See Cicorelli v. Capobianco*, 453 N.Y.S.2d 21, 22, 89 A.D.2d 842, 842-43 (2d Dep't 1982) (apportionment of fault improper where plaintiff relied on defendant's superior knowledge as to the matter for which defendant asserts that plaintiff contributed to its own harm). TSL was formed to develop a large-scale LED board on the DoubleTree Hotel. It was Panasonic that "sold" the Sign to TSL after the failure of the Millennium Sign project, assuring TSL that the Sign would display well at that location. *Cf. Korean Air Lines Co. v. McLean*, 118 F. Supp. 3d 471, 491 (2015) (truck operator not at fault for parking his truck on the shoulder of a taxiway where he reasonably relied on his employer's instructions). Moreover, there is no evidence to suggest that TSL's conduct contributed to the numerous construction delays caused by ICON's negligent handling of the project or to ICON's negligent handling and installation of the Sign that caused unsightly gaps between panels and contributed to the Sign's defects. ICON cannot therefore carry its burden of demonstrating that TSL contributed to its own injuries in the negligent construction and installation of the DoubleTree Sign. N.Y. C.P.L.R. § 1412.

As discussed with regard to MGD, *supra* Part II.C, TSL may recover from ICON damages directly caused by ICON's negligence, including the amount of TSL's economic loss, incidental and consequential damages, and lost profits. Here, TSL is entitled to recover as a proximate cause of ICON's negligence $3,990,219.00 as lost value of the DoubleTree Sign, $5,065,082.51 in compensatory damages, along with $8,205,985.11 in lost profits. Statutory prejudgment interest runs on these damages from the date of breach of duty.

28

## VI.    Panasonic's Breach of Contract Claim Against TSL Fails

Panasonic's counterclaim against TSL for breach of the DoubleTree Agreement fails because TSL was permitted to withhold payments once it became apparent that Panasonic materially breached the contract by delivering a poor-quality and defective sign.

It is a fundamental principle "that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party." *Bear, Stearns*, 361 F. Supp. 2d at 291 (citing *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997)); *see also Innovative Biodefense, Inc. v. VSP Techs, Inc.*, 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016) ("[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." (citation omitted)). Accordingly, Panasonic's breaches of the DoubleTree Agreement discharged TSL's payment obligation. [*Supra* Part III].

Briefly, as this topic has been addressed at length above, *supra* Part IV, the DoubleTree Sign has been riddled by significant and ongoing defects and has never achieved the quality warranted by Panasonic. [Hansen Decl. ¶ 116]. Panasonic has claimed that it achieved "substantial completion" when the Sign was powered up on October 29, 2015, but has acknowledged after that time that the Sign was "unacceptable for any consumer" because of its numerous defects. By December 2, 2015 – the alleged "Final Completion" date – defects and outages persisted. [*See* Dkt 174 at ¶¶ 443-44]. TSL documented and promptly notified Panasonic of these instances of contractual noncompliance and recurring defects as grounds for TSL to withhold from Panasonic further payment on the DoubleTree Sign. [*See id.* at ¶ 476]. Panasonic even acknowledged the reasons TSL has withheld payment. [Hansen Decl. ¶ 26]. As Judge Keenan held, TSL presented extensive evidence of "(1) its dissatisfaction with the DoubleTree

sign 'before, during, and after its installation,' [and] (2) Panasonic's awareness of the issues with

the sign." [Dkt. 204 at 14]. Because Panasonic first breached the DoubleTree Agreement by

providing a sign riddled by obvious defects, TSL was excused from paying additional sums on

the contract.

Moreover, TSL's evidence will demonstrate that Panasonic never achieved the

"substantial completion" or "final completion" that is required for it to be entitled to full

payment. The DoubleTree Agreement defines "substantial completion" as "the stage in the

progress . . . when the Work is sufficiently complete … so that Customer can utilize the

Integrated System for its beneficial use . . . ." [DoubleTree Agreement, Ex. A, ¶ 4.1]. Panasonic

claims substantial completion occurred on October 29, 2015, because that was purportedly the

date the DoubleTree Sign had "Display of customer content." [*See* Dkt. 174 at ¶ 421]. However,

TSL had no paying advertisers showing content on the Sign by that date. [*See id.* ¶ 431].

Moreover, as discussed above, *supra* Parts III-IV, the Sign was riddled with defects when

powered on that day.

The term "final completion" is not defined in the DoubleTree Agreement or documents

incorporated into that agreement. It appears in passing only in Section 4.1 of Exhibit A of the

agreement in non-capitalized typeface, regular font, and with no quotation marks or formal

definition. While Panasonic contends that final completion was reached on December 2, 2015,

Panasonic's own project manager and Vice President of Sales and Marketing did not believe

Panasonic had achieved final completion on that date. [*See id.* at ¶ 439]. Panasonic's argument is

further belied by the fact that the Sign continued to suffer serious defects. [Hansen Decl. ¶ 116 at

6-22]. TSL notified Panasonic on December 14, 2015 that the Sign still suffered from defects,

and continued to notify Panasonic of problems with the Sign thereafter. [Dkt. 171-3, Ex. 86; Dkt.

30

171-7, Exs. 146, 157]. Thus, TSL seasonably notified Panasonic within a reasonable time that the Sign did not conform to the contract.

Panasonic did not have the right to unilaterally designate the Sign substantially or finally complete, especially when blatant defects persisted. Instead, substantial or final completion depends on many factors appropriate for the trier of fact to determine. *Trs. of Columbia Univ. in City of N.Y. v. Gwathmey Siegel & Assoc. Architects*, 574 N.Y.S.2d 668 (1st Dep't. 1991) (that use was made of the premises is not determinative of whether there was substantial completion, particularly where plaintiff "expressed, in a persistent and unmistakable fashion, its dissatisfaction with major portions of [defendant]'s work"); *F. Garofalo Elec. Co. v. New York Univ.*, 754 N.Y.S.2d 227 (1st Dep't 2002) ("The question of whether there has been substantial performance – or a breach – is to be determined, whenever there is any doubt, by the trier of fact[.]"); s*ee also Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 243, 129 N.E. 889 (1921) ("There is no general license to install whatever, in the builder's judgment, may be regarded as 'just as good.'"). Instead, the evidence will show that Panasonic never completed the Sign as required under the DoubleTree Agreement.

TSL will present sufficient evidence that it repeatedly notified Panasonic that the DoubleTree Sign was unacceptable under the terms of the agreement such that the jury can find that TSL's failure to pay Panasonic the full purchase price was not a breach of contract.

## CONCLUSION

Based on the foregoing, Plaintiffs will demonstrate at trial that the evidence and law establish Plaintiffs' entitlement to relief for each of its claims and will defeat Panasonic's counterclaim against TSL.

DATED:  New York, New York          Respectfully Submitted,
        May 9, 2020
                                    KILPATRICK TOWNSEND & STOCKTON LLP


                                    */s/ Jonathan E. Polonsky*
                                    Frederick L. Whitmer
                                    Jonathan E. Polonsky
                                    1114 Avenue of the Americas
                                    New York, New York 10036
                                    Telephone:  (212) 775-8700
                                    Facsimile:  (212) 775-8819
                                    Email:  FWhitmer@kilpatricktownsend.com
                                    Email:  jpolonsky@kilpatricktownsend.com

                                    Cole R. Ramey (*admitted pro hac vice*)
                                    2001 Ross Avenue, Suite 4400
                                    Dallas, Texas 75201
                                    Telephone: (214) 922-7100
                                    Facsimile: (214) 922-7101
                                    Email: cramey@kilpatricktownsend.com

                                    Chad D. Hansen (*admitted pro hac vice*)
                                    1001 West Fourth Street
                                    Winston-Salem, NC 27101-2400
                                    Telephone:  (336) 607-7308
                                    Facsimile:  (336) 734-2616
                                    Email: chadhansen@kilpatricktownsend.com

                                    ***Attorneys for Plaintiffs***